**In re Cynthia Annette Riley DUDLEY, Debtor.**

**Cynthia Annette Riley Dudley, Plaintiff**

v.

**Southern Virginia University, Defendant.**

**Bankruptcy No. 10–50840.**
**Adversary No. 11–05040.**

United States Bankruptcy Court, W.D. Virginia, Harrisonburg Division.

July 23, 2013.

Roland S. Carlton, Jr., Carlton Legal
Services, PLC, Staunton, VA, for Plaintiff.

Grant A. Richardson, Bridgewater, VA, for Defendant.

### AMENDED MEMORANDUM OPINION DECLARING SOUTHERN VIRGINIA UNIVERSITY'S DEBT DISCHARGEABLE

REBECCA B. CONNELLY,
Bankruptcy Judge.

#### PROCEDURAL HISTORY

On May 18, 2010, Cynthia Riley Dudley (the "Debtor") filed a bankruptcy petition under Chapter 13 of the Bankruptcy Code. Her case was converted on May 25, 2010 to a case under Chapter 7 of the Bankruptcy Code. Southern Virginia University ("SVU" or the "University") did not file a claim in her case, but the University and its counsel appeared on the creditor mailing matrix. On September 21, 2010, the Court issued a discharge order for Ms. Dudley and, shortly thereafter, closed her case. Seven months later, on May 6, 2011, the Debtor filed a motion to re-open her case. She urged the court to reopen the case so that she could file a motion for contempt against SVU for continuing collection action after the issuance of the bankruptcy discharge order. The Court re-opened the case, and the Debtor filed her motion for contempt. SVU answered the motion by asserting that the debt it was trying to collect upon was a "qualified education loan" that is non-dischargeable under 11 U.S.C. § 523(a)(8).

The Debtor then filed a complaint alleging 2 counts: (1) that the Rockingham County default judgment on the debt allegedly owed by the Debtor to SVU was void because the Debtor did not receive actual notice of the judgment proceedings; and (2) even if the Rockingham County default judgment debt was not void, that the Court should find the debt owed by the Debtor to SVU had been discharged. On August 18, 2011, SVU filed its answer to the complaint and motion to dismiss Count 1. The contempt motion was continued generally until the adversary proceeding could be resolved because the motion for contempt hinged on the issue in contention in the adversary proceeding: whether the debt SVU was trying to collect had been discharged.

This Court abstained from hearing Count 1, finding that abstention was in the interest of justice and comity with state courts pursuant to 28 U.S.C. § 1334(c)(1). Shortly after the Court abstained from hearing Count 1, SVU filed a motion for summary judgment on Count II. SVU also filed a state court action in relation to Count 1 to determine if its judgment was valid despite the alleged notice deficiency. On September 20, 2011, SVU filed a second motion for summary judgment on Count 1 alleging that it had obtained a state court decision that affirmed the validity of its judgment debt. In October, the Debtor officially withdrew Count 1, thereby obviating the need for the Court to rule on the motion for summary judgment on Count 1.

The Debtor objected to SVU's motion for summary judgment on Count 2, arguing that the motion was improperly supported by a hearsay affidavit. The Debtor asserted that a motion for summary judgment cannot be supported by evidence that would be inadmissible at trial, citing *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962 (4th Cir.1996) and Bankruptcy Rule 7056. The Debtor also requested that a hearing on the summary judgment motion be postponed until discovery could be completed. In November, the Debtor renewed her objection by filing an official response to the motion for summary judgment, which was heard by the Court on November 16, 2011.

The Court denied SVU's motion for summary judgment on Count 2. In denying SVU's motion for summary judgment, the Court took the following facts as true from the Debtor's complaint:

At one time, Ms. Dudley was a student at SVU. When she was a student at SVU, Ms. Dudley entered into a student loan agreement with Nellie Mae. The loan agreement included a note by which Ms. Dudley agreed to repay the money loaned. When Ms. Dudley failed to repay the loan, Nellie Mae charged the loan, plus interest against SVU's reserve account.

Decision and Order at 2, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr.W.D.Va. Dec. 20, 2011), ECF No. 26. The Court found that the loan originally made by Nellie Mae to the Debtor was a qualified education loan excepted from discharge under the provisions of 11 U.S.C. § 523(a)(8). *Id.* The Court also found that SVU held a judgment debt against the Debtor. *Id.* at 4 ("there is no dispute that SVU has an outstanding claim"). What the Court was unable to decide at that point was whether, as a matter of law, the debt that SVU held was the same debt as the loan made by Nellie Mae. Even if the Court had found that the debt held by SVU was the same debt as the original Nellie Mae loan, the Court would still have had to decide whether the debt retained its status as a qualified education loan after it had been transferred and reduced to a judgment. The Court concluded that there were unresolved material issues of fact and, therefore, SVU's motion for summary judgment had to be denied. In addition, SVU had supported its contentions solely with an affidavit that was deficient because it failed to establish the personal knowledge of the affiant. *Id.* at 4–5.

Two months later, in February 2012, SVU filed a motion to reconsider the Court's denial of its first summary judgment motion. The motion for reconsideration alleged that a newly filed affidavit removed the "reliance on hearsay/personal knowledge" deficiency from its original motion for summary judgment on Count 2. The motion to reconsider also alleged that the removal of the hearsay objection combined with the Court's finding that "this is a student loan transaction," removed any remaining material factual disputes. The Debtor also filed a motion for summary judgment alleging that she was entitled to relief as a matter of law. The Debtor's motion for summary judgment reasoned that in order for SVU's debt to be excepted from discharge, SVU must show that the Nellie Mae debt was assigned to SVU, and since an assignment had not been produced, SVU could never prevail.

The Court heard SVU's motion to reconsider and the Debtor's motion for summary judgment and denied both motions. SVU's motion to reconsider misconstrued the Court's previous findings. The Court's order denying summary judgment found that the original debt owed by the Debtor to Nellie Mae was a qualified educational loan, however, the Court's denial of summary judgment did not determine if the debt on which SVU was attempting to collect was the same debt as the Nellie Mae qualified educational loan. Furthermore, in its order denying summary judgment, the Court did not determine what effect, if any, a transfer of the debt and reduction to judgment would have upon the debt's status as a qualified education loan excepted from discharge under section 523(a)(8). For these reasons, the Court denied SVU's motion to reconsider. The Court then considered the Debtor's motion for summary judgment. In her motion, the Debtor argued that SVU's failure to bring forward evidence of an assignment was fatal. The Court disagreed, holding that it is logically fallacious to

conclude that absence of evidence is evidence of absence.

In October, the Court entered a pre-trial scheduling order requiring all discovery to be completed by November 30, 2012; exchange of witness lists and proposed exhibits to occur by January 8, 2013; and for any factual stipulations to be submitted by January 15. The order also allowed that any exhibits not objected to by January 15, 2013, would stand as admitted into evidence.

Both the Debtor and SVU waited until January 15 to file witness lists and exhibits. SVU did not object to the Debtor's exhibits or witness list. The Debtor, however, filed objections to 39 of SVU's 42 exhibits.[1] Trial was scheduled for January 23 at 2:00 p.m. Concerned that it would be inefficient to hear the objections to exhibits at trial, the Court scheduled a pre-trial hearing on January 22 to allow the parties to be heard on the objections to the exhibits.

At the January 22 hearing, the Debtor withdrew 2 of her objections[2] leaving 37 remaining objections to be determined. Nearly all of the Debtor's objections cited Federal Rule of Evidence 401. The Debtor asserted that the exhibits were not relevant and should not be admitted[3] primarily because the facts they purported to prove were not material, or of consequence, to the underlying complaint.[4] The Debtor also cited Federal Rule of Evidence 403 asserting that even if relevant, the exhibits should not be admitted on the grounds of prejudice, confusion or waste of time. Finally, the Debtor argued that the exhibits were hearsay, out of court statements offered to prove the truth of the matter asserted.[5] At the January 22 hearing, the Debtor focused her argument on relevance and hearsay. The Debtor did not argue persuasively for any exhibit to be excluded under Federal Rule of Evidence 403.

SVU's counter to the charges of both hearsay and relevance was that the exhibits offered for admission would show the "business practices" of SVU in relation to Nellie Mae loans. See e.g. Hr'g Tr. at 16:6–9, 17:9–12, 18:17–19, 20:13–15, 21:1–22:4, 23:5–22, 25:7–12, 27:8, 29:12–17, 31:19–21, 33:17, 37:14, 40:3–5, Dudley v. S. Va. Univ., No. 11–05040 (Bankr.W.D.Va. January 22, 2013), ECF No. 81.[6] The Court construed SVU's argument to mean that the documents were offered to establish a habit under Federal Rule of Evidence 406. If offered to establish a habit, the exhibits would no longer be offered for the truth of the matter asserted in the exhibits. SVU, however, never referenced Federal Rule of Evidence 406 at the January 22 hearing or at the trial on January 23, and instead insisted that the exhibits were admissible under Federal Rule of Evidence 807. See generally Hr'g Tr., Dudley v. S. Va. Univ., No. 11–05040 (Bankr.W.D.Va. January 23, 2013), ECF No. 82.[7] SVU contended that many of the exhibits were admissible because the certification of Walter Ralls made Federal Rule of Evidence 807 applicable. Jan. 22 Hr'g Tr. at 46:13, 47:6–14, 63:7–9. The Court

---

1. See Objection to Def.'s Ex., Dudley v. S. Va. Univ., No. 11–05040 (Bankr.W.D.Va. Jan. 15, 2013), ECF No. 60.

2. The Debtor withdrew her objection to Exhibit B27 and B30. See H'rg Tr. at 6:15–16, Dudley v. S. Va. Univ., No. 11–05040 (Bankr. W.D.Va. January 22, 2013), ECF No. 81.

3. Fed.R.Evid. 402.

4. Fed.R.Evid. 401, 403.

5. Fed.R.Evid. 801.

6. Hereinafter "Jan. 22 Hr'g Tr."

7. Hereinafter "Jan. 23 Hr'g Tr."

found that neither the substantive requirements of Rule 807, nor its technical requirements had been met. Jan. 23 Hr'g Tr. at 3:18–4:17. The Court was unconvinced the substantive elements of Rule 807 had been met because the evidence offered was not "more probative on the point for which it is offered than any other evidence that the proponent [could] obtain through reasonable efforts."[8] *See* Fed.R.Evid. 807(a)(3). Similarly, the technical elements were not met because SVU had failed to provide the Debtor with the declarant's name and address for each proffered hearsay statement. *See* FED.R.EVID. 807(b).

Although it is clear from the hearing transcripts that SVU submitted the evidence named in the certification of Walter Ralls under Federal Rule of Evidence 807, the certification offered by SVU appears instead to have been intended to be submitted under Federal Rule of Evidence 902(11). The certification appears to track the rule for self-authentication of a regularly kept business record under Rule 902(11). Federal Rule of Evidence 902(11) allows for domestic records of a regularly conducted activity to be self-authenticating if a certification is given that the requirements of Federal Rule of Evidence 803(6)(A)-(C) have been met. FED. R. EVID. 902(11).

The Court further interpreted SVU's contention that the certification of Walter Ralls rendered the exhibits admissible under Rule 807 to mean that SVU sought to admit the exhibits under Federal Rule of Evidence 803(6). Federal Rule of Evidence 803(6) is an exception to hearsay for regularly conducted activities of an organization. The exception, however, requires

that the record be made contemporaneously with the activity, by a person with knowledge; that the record is kept in the regular course of the organization; and that making a record was a regular practice for the activity. FED.R.EVID. 803(6)(A)–(C). SVU failed to provide a custodian to testify, or certify, when the records were made, by whom, or how the records were made as part of that custodian's business. SVU offered the certification of Mr. Ralls, yet failed to offer the exhibits as self-authenticating under Federal Rule of Evidence 902, failed to timely provide notice of the intention to use the certification pursuant to Rule 902(11), and failed to show that Mr. Ralls was the appropriate custodian to make the certification. *See generally* Jan. 22 Hr'g Tr. and Jan. 23 Hr'g Tr.

In addition to the objections of hearsay and relevance, authentication of the exhibits became an issue of contention. The Court repeatedly explored the issue at the pre-trial hearing on January 22. *See* Jan 22 Hr'g Tr. at 15:23–16:4, 17:20–17:23, 20:16–20:20, 23:23–23:25, 24:23–24:25, 26:2–26:7, 28:5–28:7, 29:18–29:22, 32:10–32:16, 35:18–35:21, 36:16–36:21, 38:5–38:8, 43:18–43:23, 44:6–44:20, 50:3–51:10, 51:20–52:3, 53:25–54:18, 54:25–55:7, 56:6–56:12, 56:24–57:5, 58:18–58:23, 60:12–60:21, 61:22–62:2. At the pre-trial hearing, the Court disallowed several exhibits as inadmissible hearsay, but conditionally admitted the balance of exhibits. The following exhibits were either admitted via the pre-trial order without objection or admitted conditionally at the January 22 pre-trial hearing: A, B, B–1, B–2, B–3, B–7, B–8, B–9, B–10, B–11, B–12, B–13, B–15, B–16, B–24, B–29, B–30, B–31, K, L, M, and N.

---

8. As an example, several the exhibits offered by SVU were generated by third party collections agencies. The Court believed testimony from an agent at the collection agencies would have been more probative and would have been obtainable through the reasonable means of serving a subpoena on the employee of the collection agency.

Before the end of the January 22 hearing, SVU made an oral motion to disallow the Debtor from putting on evidence at trial for failure to provide disclosures required under Federal Rule of Civil Procedure 26. Jan. 22 Hr'g Tr. 63:14–63:20. The Court denied SVU's motion based on the language of the consent scheduling order. *Id.* at 64:18–23. The scheduling order required exchange of exhibit and witness lists by a date certain. The Court found SVU's oral motion for sanctions under Rule 26 inappropriate because Rule 26 allows for case specific orders that alter the required Rule 26 disclosures. *See* Fed.R.Civ.P. 26 (incorporated by FED. R. BANKR.P. 7026); *see also* 6–26 MOORE'S FEDERAL PRACTICE–CIVIL §§ 26.21–22, 26.26 (highlighting the ability of a court to issue case-specific orders altering, expanding or eliminating Rule 26 disclosures). SVU contended that the Court's scheduling order did not alter the Rule 26 disclosures, presumably because the scheduling order does not explicitly reference Rule 26. However, the scheduling order was a consent order and SVU, by signing the consent order, waived its ability to object under Rule 26. *See* 6–26 MOORE'S FEDERAL PRACTICE–CIVIL § 26.26.

At trial, the Debtor repeated her hearsay objections arguing: (1) the witness was not able to qualify as a custodian of the record being offered; (2) the witness lacked personal knowledge of the content of the exhibit; and/or (3) the witness was unable to establish that the contents of the exhibit were created as a regularly kept record by a person with knowledge, at the time the exhibit was created. *See* Jan. 23 Hr'g Tr. at 25:5–26:25, 35:22–39:9, 44:17–48:20, 50:9–51:7, 61:25–64:10, 66:12–68:5, 68:7–69:5, 69:7–71:6, 71:11–73:17, 73:22–75:8, 75:19–76:16, 76:18–72:3, 77:6–77:10, 92:10–100:5. Despite the contentious hearings, several important exhibits were admitted, including Debtor–Plaintiff's exhibit 1 and Defendant's exhibits A, B–3, B–10, B–12, B–15, B–16, B–27, B–30, and K. Plaintiff's exhibit 1 is a copy of the prepetition Virginia state court default judgment that is the subject debt at controversy in this case. *See* Pl.'s Ex. 1, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr. W.D.Va. Jan. 15, 2013), ECF No. 62. Defendant's exhibit A is a copy of a "Full Recourse Agreement" between SVU and Nellie Mae that provides that SVU is the guarantor on all loans made by Nellie Mae to SVU students. *See* Def.'s Ex. A, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr. W.D.Va. Jan. 16, 2013), ECF No. 66. Defendant's exhibits B–3, B–10, B–12, B–15, and B–16 are all internal accounting documents of the University. *See* Def.'s Ex. B–3, B–10, B–12, B–15, B–16, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr.W.D.Va. Jan. 16, 2013), ECF No. 66. Defendant's exhibits B–12, B–15 and B–16 list outstanding accounts, each of which contain the Debtor's name. *See* Def.'s Ex. B–12 at 2, B–15 at 6, B–16 at 6, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr.W.D.Va. Jan. 16, 2013), ECF No. 66. Defendant's exhibit B–27 is a letter on SVU letterhead, addressed to "Nellie Mae Borrower." Def.'s Ex. B–27, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr.W.D.Va. Jan. 16, 2013), ECF No. 66. Defendant's Exhibit B–30 is a copy of the Debtor's credit report as of July 15, 2004, and shows that Nellie Mae "charged off" its account with the Debtor. Def.'s Ex. B–30 at 2, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr. W.D.Va. Jan. 16, 2013), ECF No. 66. Defendant's exhibit K is a copy of the debtor's application for a Nellie Mae loan and also the promissory note for the Nellie Mae loan.[9] Def.'s Ex. K, *Dudley v. S. Va.*

---

9. Herein called the "Note."

*Univ.*, No. 11–05040 (Bankr.W.D.Va. Jan. 16, 2013), ECF No. 66.

### CONCLUSIONS OF LAW

*JURISDICTION AND THE COURT'S AUTHORITY*

This adversary proceeding is a civil proceeding arising in a case filed under Title 11 of the United States Code. Specifically, the plaintiff in this adversary proceeding is a Chapter 7 debtor and the defendant is one of her creditors. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under the Bankruptcy Code because it is a proceeding to determine the dischargeability of a particular debt. 28 U.S.C. § 157(b)(2)(I). This Bankruptcy Court can hear this matter pursuant to 28 U.S.C. § 157 and the Western District of Virginia District Court Order of Reference.[10]

### Constitutional Authority and the *Stern v. Marshall* Opinion

■ In *Stern v. Marshall*, the Supreme Court found that a bankruptcy court may have statutory authority to hear a "core proceeding" under 28 U.S.C. § 157, yet not Constitutional authority to issue a final judgment in that proceeding. *Stern v. Marshall*, — U.S. —, 131 S.Ct. 2594, 2608, 180 L.Ed.2d 475 (2011). In *Stern*, the Supreme Court determined that a bankruptcy court could not issue a final ruling on a state law counterclaim against a non-creditor third party even if the counterclaim was a core proceeding. *Id.* at 2615. The test for whether a bankruptcy court has Constitutional authority to enter final judgment is "whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 2618. The dispute in this case turns on whether the debt

that the defendant is seeking to collect from the Plaintiff was discharged in the Plaintiff's Chapter 7 bankruptcy case. This question stems directly from the Plaintiff's bankruptcy, and requires the application of bankruptcy law. The Court concludes that it has authority to issue a final ruling in this core proceeding; the *Stern* holding does not call into question this conclusion.

### SVU's Motion to Dismiss for Lack of Jurisdiction

■ On the morning of the trial, SVU filed a motion to dismiss this adversary proceeding for lack of jurisdiction. SVU cited as its grounds *Stern v. Marshall.* According to SVU's motion filed on the day of the trial, SVU does not consent to the jurisdiction of this Court; the question of dischargeability is not before the Court; therefore, the Court has no jurisdiction to decide the matter. These facts, according to SVU, compel dismissal. The Court heard the arguments of SVU, considered the pleading, and denied the motion to dismiss. SVU's motion ignores the fact that the Plaintiff is a debtor in bankruptcy in this Court. This Court has subject matter jurisdiction over the bankruptcy case, as well as the proceeding seeking a declaration of the dischargeability of the SVU debt. SVU has participated, actively, in this adversary proceeding and only on the morning following a lengthy hearing in which the admissibility of some of SVU's exhibits had been questioned did SVU announce that it did not consent to the jurisdiction of the Court. The Court disagrees with SVU's statement that dischargeability is not before the Court. The Court finds that the crux of the dispute in this proceeding is the dischargeability of SVU's

---

**10.** *See* Order of Reference December 6, 1994; and Western District of Virginia District Court Local Rule 3.

claim. The Court concludes, therefore, that this Court may enter a final ruling. Even if, however, it is determined that this Court does not have the Constitutional authority to enter a final ruling in this matter, the result would be that this ruling would be deemed findings of fact and proposed conclusions of law for the District Court. Dismissal for lack of jurisdiction is not appropriate. *See Elgin v. Dept. of Treasury,* —— U.S. ——, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012) (holding that a non-Article III tribunal may hold and conduct evidentiary hearings, make findings of fact and proposed conclusions of law, even if it does not have Constitutional authority to issue a final ruling).

### BURDEN OF PERSUASION

■ Generally, a creditor has the burden to show that its debt is excluded from discharge. *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (U.S.1991); *Nunnery v. Rountree (In re Rountree),* 330 B.R. 166, 170 (E.D.Va. 2004). In *Grogan,* the Supreme Court explained the balancing of policy objectives that leads to the conclusion that the creditor bears the burden:

> The statutory provisions governing non-dischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts—such as child support, alimony,

and certain unpaid educational loans and taxes, as well as liabilities for fraud. Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start. We think it unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud. Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests.

498 U.S. at 287, 111 S.Ct. 654. The Debtor asserts that SVU has the burden to show that its debt is excepted from discharge. See Jan. 23 H'rg Tr. at 12:22–23. The Debtor's assertion has not been disputed. Nor has this Court found any case law or statutory law indicating that burden must be shifted simply because the Debtor is the Plaintiff in this action.[11] Therefore, the Court concludes that SVU has the burden to show that its debt is one that is excepted from discharge.[12]

The Debtor provided uncontroverted evidence to the Court of the following: (1) she obtained a discharge under Chapter 7; (2) she had a pre-petition debt to SVU;[13]

---

**11.** Moore's Federal Practice acknowledges that confusion can arise when, as in many declaratory judgment suites, the positions of the Plaintiff and defendant are transposed. 12–57 MOORE'S FEDERAL PRACTICE—CIVIL § 57.62. Moore's states that no clear rule of law exists to resolve this confusion. *Id.*

**12.** If SVU carries its burden, the burden would shift to the Debtor to show by a preponderance of the evidence that the debt is an undue burden on her and her dependents. *Spence v. Educ. Credit Mgmt. Corp. (In re Spence),* 541 F.3d 538, 543–544 (4th Cir.2008)

(citing *Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko),* 515 F.3d 319, 324 (4th Cir.2008)). In this case, an undue burden has not been plead by the Debtor, therefore the only relevant burden is SVU's initial burden to show that the debt is non-dischargeable.

**13.** The Debtor claimed that at one time, she entered into a loan directly with SVU to pay for tuition and fees. *See* Def.'s Ex. B–21, B–22, and B–23. Debtor's counsel argued in his closing that the debt SVU was trying to collect may have been for this direct loan and not the Nellie Mae loan. Debtor's counsel

(3) she provided notice of her bankruptcy to SVU; and (4) following the discharge order, SVU obtained judgment (or began collection activity). The Debtor argues, therefore, that the debt to SVU was discharged and not subject to collection activity after the discharge order. SVU argues, on the other hand, that the debt is excepted from discharge under 11 U.S.C. § 523(a)(8).

### 11 U.S.C. § 523(a)(8)

■ Section 523(a)(8) of the Bankruptcy Code provides that "qualified educational loans" are excepted from discharge in bankruptcy, unless the loan imposes an "undue hardship" on the debtor and the debtor's dependents. 11 U.S.C. § 523(a)(8). In this case, the Debtor argues that the debt held by SVU is not a "qualified educational loan." It is undisputed that at one time, the Debtor financed part of her education at SVU with a loan from Nellie Mae. It is also undisputed that at the time of origination, that the loan by Nellie Mae to the Debtor was a qualified educational loan, non-dischargeable under section 523(a)(8). What is in dispute is whether the debt currently held by SVU is a non-dischargeable qualified educational loan debt. For this Court to find that the debt held by SVU is a non-dischargeable loan debt, SVU must prove either: (1) that the debt SVU currently holds is the same debt as the Nellie Mae loan made to the Debtor *and* that the debt has retained its characterization as a qualified educational loan debt; or (2) SVU must prove the debt it holds is a qualified educational loan that SVU made with the Debtor.

SVU has not claimed that it originated a qualified education loan with the Debtor, nor has SVU presented any evidence that

would allow it to succeed on that theory. The only theory presented by SVU is that its judgment debt is the same debt as the Nellie Mae loan. In order for the Court to determine if SVU has succeeded in showing that its judgment is the same debt as the Nellie Mae loan, the Court must examine the state court judgment held by SVU.

The Court has very little evidence regarding the state court judgment. Debtor's Exhibit 1 is a copy of the state court judgment. *See* Pl.'s Ex. 1. The state court judgment is a copy of the warrant in debt that has been stamped "JUDGEMENT." *See id.* However, this warrant in debt/judgment does not provide any information as to what exact debt the judgment is based upon. As such, the Court is forced to determine what debt was represented by the pre-petition state court judgment by looking to other evidence. In doing so, the Court attempts not to disturb the state court judgment and assumes that the default judgment entered by the state court was proper; *i.e.* the debt held by SVU was valid, enforceable, and not barred by law or equity. *See In re Heckert,* 272 F.3d 253, 259–60 (4th Cir.2001) (finding that in determining whether a state court judgment was dischargeable, the bankruptcy court was required to give the state court judgment full faith and credit and could not alter or amend the terms of the judgment); *In re Ansari,* 113 F.3d 17, 19–20 (4th Cir.1997) (holding that a Virginia state court's entry of a default judgment to be entitled to full faith and credit).

In light of the information available regarding the basis for the default judgment and the theory put forth by SVU, the Court determines that, as a threshold mat-

---

further argued that it was SVU's burden to show that the debt it was trying to collect was the Nellie Mae loan and not the direct loan

from SVU. The Debtor asserted that the loan with SVU for fees and tuition was discharged, and SVU did not contest this statement.

ter, SVU must show that it was entitled to enforce the Note in order for it to be possible that the state court default judgment debt and the debt evidenced by the Note are the same debts. This threshold inquiry is required because we assume the validity of the state court judgment. The state court would not have granted a judgment on an unenforceable debt. Therefore, if the judgment debt represents the Note, then SVU should be able to prove that it can enforce the Note.[14] If SVU cannot show that it can enforce the Note, then the state court judgment is not based upon the Note. Assuming SVU is able to show that the debts are the same, SVU would still need to show that the non-dischargeable nature of the debt in the hands of Nellie Mae was not lost by a subsequent transfer to SVU. The Court does not reach the latter question because it finds, for the following reasons that SVU has failed to show that it was entitled to enforce the Note.

### CHOICE OF LAW

■ SVU has argued and alluded to several state law contract theories, such as assignment subrogation, and commercial paper, to establish that it was entitled to enforce the Note. While this Court would generally apply Virginia commercial and contract law in similar cases involving two Virginia residents and an underlying state law issue,[15] the documents giving rise to SVU's state law theories contain choice of law clauses. Def.'s Ex. A and K, *Dudley,* No. 11–05040, ECF No. 66. As this Court sits in Virginia, we apply Virginia choice of law rules to determine the validity and effect of the parties' choice of law provi-

sions. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ("The conflict of laws rules to be applied by the federal court in [State X] must conform to those prevailing in [State X's] state courts."). Virginia law recognizes and gives effect to choice of law provisions such as the ones at issue here. *Colgan Air, Inc. v. Raytheon Aircraft Co.,* 507 F.3d 270, 275 (4th Cir.2007); *Paul Business Systems, Inc. v. Canon USA, Inc.,* 240 Va. 337, 397 S.E.2d 804, 807 (1990). The choice of law provisions contained in the Note and Agreement are effective and require application of Massachusetts law to determine whether SVU acquired Nellie Mae's rights under the Note. Def.'s Ex. A and K *Dudley,* No. 11–05040, ECF No. 66.

### COMMERCIAL PAPER AND ARTICLE 3

■ Promissory notes, such as the one at issue in this case, are often negotiable instruments and are governed, therefore, by Article 3 of Massachusetts' version of the Uniform Commercial Code (the "UCC"). MASS. GEN. LAWS ch. 106, § 3–102(a) (2012) ("This Article shall apply to negotiable instruments."). If the Note is a negotiable instrument, Article 3 provides particular requirements for enforceability. The first question the Court must answer is whether the Note is a negotiable instrument.

A negotiable instrument is:

an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

---

**14.** One of the simplest ways SVU could have demonstrated its ability to enforce the Note would have been to produce the instrument itself. SVU did not produce the Note because it claimed that the Note had been lost.

**15.** In general, choice of law issues do not arise in cases invoking federal question jurisdiction. However, a federal court is required to apply the forum state's law, including its choice of law principles, whenever a substantive issue of state law arises in a case.

(1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) is payable on demand or at a definite time; and

(3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.

MASS. GEN. LAWS ch. 106, § 3–104(a) (2012). In addition to outlining the elements of a negotiable instrument, Article 3 goes on to define those various elements. For instance, a promise is unconditional as long as it does not state "(i) an express condition to payment, (ii) that the promise or order is subject to or governed by another writing, or (iii) that rights or obligations with respect to the promise or order are stated in another writing." MASS. GEN. LAWS ch. 106, § 3–106(a) (2012). Furthermore, section 3–109 explains the difference between when a promise is payable to bearer or to order:

(a) A promise or order is payable to bearer if it:

(1) states that it is payable to bearer or to the order of bearer or otherwise indicates that the person in possession of the promise or order is entitled to payment;

(2) does not state a payee; or

(3) states that it is payable to or to the order of cash or otherwise indicates that it is not payable to an identified person.

(b) A promise or order that is not payable to bearer is payable to order if it is payable (i) to the order of an identified person or (ii) to an identified person or order. A promise or order that is payable to order is payable to the identified person.

MASS. GEN. LAWS ch. 106, § 3–109 (2012). Additionally, section 3–108 outlines the differences between payable on demand and payable at definite time:

(a) A promise or order is "payable on demand" if it (i) states that it is payable on demand or at sight, or otherwise indicates that it is payable at the will of the holder, or (ii) does not state any time of payment.

(b) A promise or order is "payable at a definite time" if it is payable on elapse of a definite period of time after sight or acceptance or at a fixed date or dates or at a time or times readily ascertainable at the time the promise or order is issued, subject to rights of (i) prepayment, (ii) acceleration, (iii) extension at the option of the holder, or (iv) extension to a further definite time at the option of the maker or acceptor or automatically upon or after a specified act or event.

MASS. GEN. LAWS ch. 106, § 3–108 (2012).

Based on the definition of negotiable instrument provided by Article 3, the Court finds that the Note is a negotiable instrument.[16] The Note is an uncondition-

---

**16.** In the alternative, if the Note is not a negotiable instrument, Defendant's ability to enforce the terms of the contract, as expressed in the Note, between Debtor and Nellie Mae, would be governed by the common law of contracts. *See JPMorgan Chase & Co.*

*v. Casarano*, 2010 WL 3605427, *5–*6 (Mass. Land Ct.). In particular, the law of assignments and/or the doctrine of subrogation would be applicable. As the *Nonholder in Possession with the Rights of a Holder* section addresses these theories as they apply to the

al promise to pay. A thorough review of the Note's terms reveals that the Note does not contain any conditions to payment, is not subject to a separate writing, and does not state rights and responsibilities in a separate writing. *See* Def.'s Ex. K, ¶ F, *Dudley*, No. 11–05040, ECF No. 66. Second, the Note is payable to order. Paragraph F of the Note reads, "each of the undersigned ... agrees to pay to the order of Lender named above or to any subsequent holder of this Promissory Note...." *Id.* As such, the Note specifies a particular person to whom payment must be made. *See* Mass. Gen. Laws ch. 106, § 3–109(b)(i) (2012). Third, the Note is payable at a definite time. Paragraph 5 of the Note states that payments shall begin on the earlier of four years from the date of disbursement or forty-five days after the student-beneficiary of the Note graduates or ceases to be enrolled in a qualified institution. *See* Def.'s Ex. K, ¶ 5, *Dudley*, No. 11–05040, ECF No. 66. As such, the Note is payable at a fixed date. The Note, therefore, is an unconditional promise to pay to order at a definite time and does not force any condition on the promisor other than the promise to pay. Given these facts, the Court concludes that the Note at issue is a negotiable instrument under section 3–102(a).

### Defendant's Ability to Enforce the Note

Under Massachusetts' version of Article 3, possession of the negotiable instrument sought to be enforced is a prerequisite to enforceability. Section 3–301 provides that a person is entitled to enforce a negotiable instrument if: a) he is the holder of the instrument; b) he is a nonholder in possession with rights of a holder; or c) he meets the requirements of 3–309. Mass. Gen. Laws ch. 106, § 3–301 (2012). The avenues of enforceability under section 3–301 all share a common characteristic: the person seeking to enforce the negotiable instrument must have had actual possession of the instrument at one time. Massachusetts law defines both a "holder" [17] and a "nonholder," [18] in part, as an individual who currently possess a negotiable instrument; the difference being that a holder possesses a "negotiated negotiable instrument," [19] whereas a nonholder possesses a "non-negotiated negotiable instrument." [20] Section 3–301 provides only one exception to the current possession requirement in the case of a lost or

facts of this case and the results thereunder, the Court does not address this alternative theory of relief at this time. If it was found that the Note was not a negotiable instrument, the Court would rely on its analysis of Massachusetts contract law to dispose of the matter.

17. A "holder" is an individual or entity that is transferred possession of a negotiated instrument by a transferor who is not the issuer. *See* Mass. Gen. Laws ch. 106, § 3–201(a) (2012).

18. A "nonholder in possession with rights of a holder" is an individual or entity that is transferred possession of a non-negotiated instrument and acquires the rights of the previous holder by subrogation or assignment and is a successor to the holder, or otherwise acquires the holder's rights. *See* comment to Mass. Gen. Laws ch. 106, § 3–301 (2012).

19. A "negotiated negotiable instrument" is a negotiable instrument that has been transferred to another with the proper indorsement by the transferor or the transfer of an instrument payable to bearer. Mass. Gen. Laws ch. 106, § 3–201 (2012). A non-negotiated negotiable instrument, therefore, is a negotiable instrument that has been transferred to another without the proper indorsement and is not payable to bearer.

20. A "non-negotiated negotiable instrument" is a negotiable instrument that has been transferred to another without the proper indorsement and is not payable to bearer. Mass. Gen. Laws ch. 106, § 3–201 (2012).

destroyed instrument. By incorporating section 3–309, section 3–301 permits an individual to enforce a lost or destroyed negotiable instrument, so long as the conditions of section 3–309 are met. Of importance to this analysis, section 3–309 permits enforcement of a lost or destroyed instrument only if the person seeking enforcement can establish that he was in possession of the instrument and entitled to enforce it at the time possession was lost or destroyed.[21] MASS. GEN. LAWS ch. 106, § 3–309(a) (2012). Based on the definitions of holder, nonholder, and the requirements of section 3–309 under Massachusetts' version of the UCC, possession of the negotiable instrument at one time is a requirement for enforceability under section 3–301. As such, to show that it was entitled to enforce the Note, SVU must at least show that it was transferred possession of the Note at some point in time.

### Transfer of Possession of the Note to Defendant

▆▆▆ As a negotiable instrument, the transfer of the Note and its corresponding rights are governed by Article 3.[22] *See* MASS. GEN. LAWS ch. 106, §§ 3–203 (2012); *Premier Capital v. Gavin,* 319 B.R. 27, 31 (1st Cir. BAP 2004). When a person transfers[23] an instrument to another, the transfer vests the transferee with the rights of the transferor and the power to enforce such rights. MASS. GEN. LAWS ch. 106, §§ 3–203(b) (2012). A transfer of possession of a negotiable instrument occurs when a transferor delivers the instrument to a transferee with the purpose of giving the transferee the right to enforce the instrument. MASS. GEN. LAWS ch. 106, § 3–203(a) (2012). Under this definition of transfer, a transfer does not take place without actual delivery of the instrument into the transferee's physical possession. *See* MASS. GEN. LAWS ch. 106, § 3–203, comment 1 (2012). The comment provides an explanatory example:

> [S]uppose X is the owner and holder of an instrument payable to X. X sells the instrument to Y but is unable to deliver immediate possession to Y. Instead, X signs a document conveying all of X's right, title, and interest in the instrument to Y. Although the document may be effective to give Y a claim to ownership of the instrument, Y is not a person entitled to enforce the instrument until Y obtains possession of the instrument. No transfer of the instrument occurs under Section 3–203(a) until it is delivered to Y.

*Id.* Furthermore, the case law states that proof of a transfer must be shown by direct evidence and not circumstantial evidence. *Marks v. Braunstein,* 439 B.R. 248, 251 (D.Mass.2010) (finding that pro-

---

21. Unlike the UCC version, Massachusetts does not permit an individual who has never acquired possession to enforce a negotiable instrument. Under the UCC version, acquisition of an ownership interest from someone entitled to enforce is sufficient. *Compare* MASS. GEN. LAWS ch. 106, § 3–309(a) (2012) *with* U.C.C. § 3–309(a)(1)(B) ("A person not in possession of an instrument is entitled to enforce the instrument if—the person seeking to enforce the instrument—has directly or indirectly acquired ownership of the instrument from a person who was entitled to enforce the instrument when loss of possession occurred.").

22. Defendant failed to address the UCC, as adopted by Massachusetts, and its various requirements for enforceability at the hearing; rather, Defendant made conclusory and unsubstantiated references to terms defined therein. *See generally* Jan. 23 Hr'g Tr.

23. MASS. GEN. LAWS ch. 106, § 3–203(a) (2012) defines "transfer" as the delivery of an instrument by a person other than the issuer to another for the purpose of giving the person the right to enforce the instrument.

duction of a recorded assignment was insufficient to show transfer of the instrument assigned because it did not provide direct evidence of possession of the negotiable instrument). With this understanding of transfer in mind, the Court seeks to determine whether SVU has provided sufficient direct evidence to show that Nellie Mae transferred the Note to SVU.

 SVU presented internal accounting documents listing outstanding accounts, each of which contain the Debtor's name. *See* Def.'s Ex. B–12 at 2, B–15 at 6, and B–16 at 6, *Dudley,* No. 11–05040, ECF No. 66. These documents, however, fail to contain any information regarding how the Debtor's account was established, what the basis of the debt was, or any indication of a transfer of the Note from Nellie Mae to SVU. *Id.* Furthermore, SVU failed to elicit testimony from its witnesses that could answer these questions or explain the entries regarding the Debtor in more detail. *See* Jan. 23 H'rg Tr.

Defendants also presented a letter on SVU letterhead, addressed to "Nellie Mae Borrower" as evidence that Nellie Mae had transferred possession of the Note to SVU. Def.'s Ex. B–27, *Dudley,* No. 11–05040, ECF No. 66. The letter, however, provides little support for such a proposition and, actually, provides greater support for the proposition that Nellie Mae or its third-party collection agency had possession of the Note at the time the letter was written. The letter on countless occasions refers to the "Nellie Mae Loan," directs the borrower to contact Nellie Mae, and instructs the borrower to pay Nellie Mae to rehabilitate the loan. *Id.* Had possession been transferred to SVU, Nellie Mae would not have been entitled to payment under the Note,[24] and presumably, the letter would have instructed the bor-

rower to contact SVU, rather than Nellie Mae.

Furthermore, the Debtor's credit report as of July 15, 2004, shows that Nellie Mae "charged off" its account with the Debtor. Def.'s Ex. B–30 at 2, *Dudley,* No. 11–05040, ECF No. 66. The credit report also shows that USAG (most likely USA Group, Nellie Mae's collection agency, *see* Def.'s Ex. 27 at 2, *Dudley,* No. 11–05040, ECF No. 66) had "transferred or sold" a debt. *Id.* Had Nellie Mae transferred or assigned the Note to SVU, the Court would expect to see something more akin to the "transferred or sold" language next to the Nellie Mae debt, as opposed to the "charged off" language.

In addition to the exhibits, SVU called Jaquie McDonnell, Director of Loan Accounting for Sallie Mae, as a witness. *See generally* Jan. 23 Hr'g Tr. at 18–32. Ms. McDonnell's position at Sallie Mae requires her to supervise loan accounting for student loans serviced through Sallie Mae, which include loans issued by Nellie Mae. *Id.* at 19–20. Ms. McDonnell, however, did little to help establish that Nellie Mae transferred the Note to SVU. In particular, Ms. McDonnell admitted that the information she had regarding the Note was provided by SVU and was not contained in Nellie Mae's records. *Id.* at 26: 2–15 ("Q. Okay. How did you obtain the record then? A. I obtained it from Southern Virginia.").

The Court finds that SVU has failed to provide sufficient evidence that Nellie Mae transferred possession of the Note to SVU. SVU has not provided the Court with direct evidence of the Note's transfer from Nellie Mae's possession to SVU's. Without such a showing, SVU cannot show that it can enforce the Note. *Marks,* 439 B.R. at 251. Further, the Court finds that even if the direct evidence rule was not a bar to

---

**24.** *See* Mass. Gen. Laws ch. 106, § 3–301 (2012).

SVU's relief, the circumstantial evidence presented is insufficient to establish that Nellie Mae ever transferred possession of the Note to SVU. As SVU has failed to establish that it was ever in possession of the Note, it has failed to establish that it was ever entitled to enforce the Note. *See* MASS. GEN. LAWS ch. 106, § 3–309 (2012). Without proof sufficient to show that it was entitled to enforce the Note, SVU cannot establish that the debt underlying the state court default judgment is the same debt underlying the Note issued between Nellie Mae and the Debtor.[25] Therefore, SVU has failed to carry its burden of showing that the debt underlying the state court default judgment was a non-dischargeable debt under 11 U.S.C. § 523(a)(8).

### Assuming Transfer of Possession, Was SVU Ever Entitled to Enforce?

 Assuming there was evidence that Nellie Mae transferred possession of the Note to SVU, the fact remains that SVU has failed to produce the Note because it is currently lost. Without current possession of the Note, SVU's ability to enforce the Note is controlled by section 3–309. *See* MASS. GEN. LAWS ch. 106, § 3–301 (2012); *comment* to § 3–301; and MASS. GEN. LAWS ch. 106, § 3–201(a) (2012). Section 3–309 entitles an individual to enforce an instrument he is not currently in possession of if: (1) he was in possession[26] of and entitled to enforce the instrument when possession ceased; (2) he cannot reasonably obtain possession because the instrument was destroyed, its whereabouts cannot be determined, or is in the wrongful possession of another who is unknown, cannot be found, or is not amenable to service of process; and (3) the loss of possession did not result from a transfer or lawful seizure.[27] MASS. GEN. LAWS ch. 106, § 3–309(a) (2012); *Marks*, 439 B.R. at 250–51. Assuming possession at one time, SVU must still show, under section 3–309, that it was able to enforce the Note when it had possession. In order to show this, SVU would have to show that during its possession of the Note it was either a holder of the Note or a nonholder in possession with the rights of a holder. *See* MASS. GEN. LAWS ch. 106, § 3–301 (2012). For the following reasons, the Court finds that, even if it is assumed SVU possessed the Note at one time, SVU has failed to establish that it was ever entitled to enforce the Note as either a holder or a nonholder in possession with the rights of a holder.

### *Defendant as a Holder*[28]

 Article 3 does not directly define the term "holder." *See* MASS. GEN. LAWS

---

25. If SVU cannot enforce the Note, the judgment debt it holds cannot be based on the debt evidenced by the Note because the state court would not have entered a judgment on an unenforceable debt.

26. As the Court has already addressed and analyzed the issue of transfer, for purposes of analyzing enforceability under section 3–309, the Court will assume that SVU was in possession of the Note prior to its disappearance. The purpose of this analysis is to illustrate that even if it is assumed that SVU possessed the Note at one time, the available evidence fails to demonstrate that SVU could have enforced the Note.

27. Additionally, the individual attempting to enforce the absent instrument must prove the terms of the instrument and his right to enforce the instrument. MASS. GEN. LAWS ch. 106, § 3–309(b) (2012); *Marks*, 439 B.R. at 251. Lastly, as an additional safeguard, the Court is not to enter judgment in favor of the enforcement seeker unless the Court determines that the payor is adequately protected against loss from alternative claims to enforce the same instrument. *Id.*

28. At the hearing, Defendant stated that it was the holder of the Note, but did not provide the Court with any explanation as to how it came to that conclusion. Defendant did not

ch. 106, §§ 3–103(a)–(d) (2012). The term, however, is defined indirectly through the UCC's definition of "negotiation." [29] According to the definition of "negotiation," a "holder" is a one who is transferred possession of a negotiated instrument by a transferor who is not the issuer. *See* MASS. GEN. LAWS ch. 106, § 3–201(a) (2012). Therefore, to be a holder of the Note, the Defendant must show that Nellie Mae was not the issuer of the Note, that Nellie Mae transferred possession of the Note to Defendant, and that the Note was negotiated.[30]

▮ An issuer is the maker or drawer of an instrument, which means the person who signs or is identified in a note or draft as a person undertaking to pay or ordering payment, respectively. *See* MASS. GEN. LAWS ch. 106, §§ 3–105(c) and 3–103(5) and (7) (2012). Nellie Mae is neither a maker nor a drawer of the Note and is, therefore, not the issuer of the Note. As the terms of the Note make clear, the Debtor is the issuer of the Note. *See* Def.'s Ex. K, ¶ F, *Dudley*, No. 11–05040, ECF No. 66.

Transfer of possession is governed by section 3–203. As addressed above, the Court is assuming for purposes of its enforcement analysis under section 3–309 that possession of the Note was transferred to SVU.[31]

▮ Lastly, SVU would need to show that the Note had been negotiated. Under section 3–201, a note payable to an identified person is negotiated by transferring possession of an instrument indorsed by the transferor. MASS. GEN. LAWS ch. 106, § 3–201(b) (2012). A note is indorsed when signed by the holder of the note, for the purpose of negotiating it, restricting payment on it, or incurring liability on the note, or accompanied by an affixed, signed writing to the same. MASS. GEN. LAWS ch. 106, § 3–204(a) (2012). Even if the Court assumes SVU possessed the note, SVU must provide the Court with evidence that the Note was indorsed to it by Nellie Mae because the Note was payable to an identified person. *See New Haven Savings Bank v. Follins*, 431 F.Supp.2d 183, 194–5 (D.Mass.2006). The record is void of any such evidence that would lead the Court to believe that the Note was ever indorsed to SVU. The actual Note is missing, so the Court cannot examine it for indorsements. Furthermore, SVU has neither provided testimony from Nellie Mae that the Note was indorsed to SVU, nor testimony from SVU that it received an indorsed Note from Nellie Mae. Therefore, even assuming the existence of a transfer of possession of the Note from Nellie Mae to SVU, SVU has failed to provide any direct or circumstantial evidence that would establish that the Note was indorsed and, as such, negotiated. Therefore, even if SVU had possessed the note at one time, the current evidence could not support a finding that SVU was a holder of the Note. Without such a finding, SVU cannot claim

---

address the definition of "holder" under Ma. St. § 3–201. *See generally* Jan. 23 Hr'g Tr.

29. Section 3–201(a) reads, " 'Negotiation' means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person *who thereby becomes its holder*." MASS. GEN LAWS ch. 106, § 3–201(a) (2012) (emphasis added).

30. SVU claims to have acquired its rights directly from Nellie Mae. It would be possible for SVU to have acquired Nellie Mae's rights

via a transfer from Nellie Mae to a third party and then from the third party to SVU. As SVU has not claimed that it received its rights from a third party, the Court does not consider that possibility.

31. As discussed previously, the Defendant's evidence fails to establish that Nellie Mae ever physically delivered the Note to it. The same conclusion would be reached under this analysis.

to have been a holder when it possessed the Note; thus, eliminating one avenue of enforceability under section 3–309.

### Nonholder in Possession with the Rights of a Holder

 Having ruled out SVU's ability to enforce the Note as a holder under section 3–309, the only enforcement mechanism left for the Court to explore is SVU's ability to enforce the Note under section 3–309 as a nonholder in possession with the rights of a holder.[32] As stated previously, a nonholder in possession with rights of a holder is a person that is transferred possession of a non-negotiated negotiable instrument and acquires the rights of the previous holder by subrogation, assignment, succession, or otherwise. *See comment to* MASS. GEN. LAWS ch. 106, § 3–301 (2012); *Duxbury v. Roberts,* 388 Mass. 385, 446 N.E.2d 401, 403–4 (1983) (finding that even though negotiable instrument was not negotiated, plaintiff acquired right of his transferor through a written, signed assignment of the instrument). Of consequence in this action is whether SVU was assigned or, in the alternative, subrogated to the rights of Nellie Mae under the Note.[33]

### Assignment of the Note

 Under Massachusetts law,[34] an assignment of a contract right is the manifestation of the obligee's intent to transfer rights under the contract to another person, the assignee, so that the obligor's performance under the contract is due to the assignee, not the obligor. *See In re Computer Engineering Assoc., Inc.,* 337 F.3d 38, 46 (1st Cir.2003). The assignment need not be in writing, but the assignment must exhibit an intent to assign a present right, identify the subject matter assigned, and must be accompanied by a divesture of control over the subject matter assigned. *Cheswell, Inc. v. Premier Homes and Land Corp.,* 326 F.Supp.2d 201, 202 (D.Mass.2004). Although the intent of the parties is important, when an assignment involves the transfer of a negotiable instrument, the parties need to provide direct evidence of the assignment. *New Haven Savings Bank,* 431 F.Supp.2d at 198 (considering production of the original loan, various powers of attorney, written assignment, prior purchase agreement and bill of sale, as well as an affidavit of a loan manager to be sufficient to establish assignment of the Note); *Norfolk Financial Corp. v. Mazard,* 2009 WL 3844481, *3 (Mass.App.Div.2009) (citing *New Haven Savings Bank*) (finding that failure to submit direct and admissible evidence tending to prove assignment to be fatal). The reliance on direct evidence stems from section 3–309(b)'s requirement that the

---

**32.** This analysis still assumes that SVU had possession of the Note at one time. The Court has previously found that SVU did not produce sufficient evidence to find that it did possess the Note.

**33.** *Money Store/Massachusetts, Inc. v. Hingham Mutual Fire Insurance Co.,* 430 Mass. 298, 718 N.E.2d 840, 842–3 (1999) ("Subrogation and assignment are not the functional equivalent of each other. The former speaks in terms of broader equitable rights and remedies.").

**34.** The Agreement entered into by Nellie Mae and SVU provides for how and when assignment of Nellie Mae's rights to SVU will occur. Def.'s Exhibit A, ¶ 1, *Dudley,* No. 11–05040, ECF No. 66. Furthermore, the Agreement provides that the agreement will be construed in accordance with the laws of Massachusetts. *Id.* at ¶ 9. Therefore, the legal analysis of any assignment made in accordance with the terms of the agreement would need to be construed in accordance with Massachusetts law. As such, we apply Massachusetts law to guide our determination of whether Nellie Mae assigned its rights under the Note to SVU, as SVU claims.

proponent of enforcement provide direct evidence of the instrument's terms, ownership, and adequate protection from multiple recoveries. *See* MASS. GEN. LAWS ch. 106, § 3–309(b) (2012); *Premier Capital,* 319 B.R. at 32–3 (interpreting the requirements of MASS. GEN. LAWS ch. 106, § 3–309(b) (2012)) ("Article 3 makes clear that a break in the chain of title is bridged not by drawing a 'reasonable inference' from circumstantial evidence, but by providing direct evidence. . . .").

The Court finds that SVU has failed to establish that Nellie Mae assigned its rights under the Note to SVU. SVU has failed to provide any direct evidence of an assignment from Nellie Mae. There is no evidence of a written assignment, no recordation of an assignment, and no testimony from a witness with knowledge of an intent to assign the Note to SVU.

▮▮▮ Furthermore, the evidence available is the same as that analyzed with regard to transfer of possession. Although assignment is legally distinct from transfer, the Court's conclusions are the same. SVU's internal financial statements,[35] the letter from SVU to the debtor,[36] and the debtor's credit report[37] are not direct evidence of an intent by Nellie Mae to assign a then-existing present right in the Note to SVU and to divest itself of control over the Note. *See Cheswell, Inc.,* 326 F.Supp.2d at 202. The accounting documents only show SVU believed Debtor owed it money. The Debtor's credit report contradicts SVU's theory that the letter establishes that it was assigned the Note. The letter is dated September 22, 1999. *See* Def.'s Ex. B–27, *Dudley,* No. 11–05040, ECF No. 66. The credit report establishes that Nellie Mae maintained an ownership interest in the Note until June 2002, when the Note was charged off. *See* Def.'s Ex. B–30, *Dudley,* No. 11–05040, ECF No. 66. If Nellie Mae maintained an ownership interest in the Note until June 2002, Nellie Mae could not have assigned SVU the Note in 1999 because Nellie Mae apparently did not divest itself of control until approximately three years later.

In addition, the Note states that notice will be given to the obligor in the event Nellie Mae's interest and rights under the Note are assigned. Def.'s Ex. K, ¶ 10, *Dudley,* No. 11–05040, ECF No. 66. There was no evidence presented that Debtor ever received or was sent notice of any assignment of Nellie Mae's rights under the Note. As the terms of the Note expressly provide for notice in the event of an assignment, the lack of notice of an assignment is circumstantial evidence that an assignment of Nellie Mae's interest in the Note never occurred.

Without direct evidence of an assignment from Nellie Mae to SVU, the Court cannot conclude that Nellie Mae assigned the Note to SVU. Even when the Court considers the circumstantial evidence before it, the evidence on the record is insufficient to establish that Nellie Mae ever assigned the note to SVU.[38] Without proof

---

**35.** Def's Ex. B–12, B–15, and B–16, *Dudley,* No. 11–05040, ECF No. 66.

**36.** Def.'s Ex. B–27, *Dudley,* No. 11–05040, ECF No. 66.

**37.** Def.'s Ex. B–30, *Dudley,* No. 11–05040, ECF No. 66.

**38.** At trial, it appeared that SVU believed all it needed to show was that the Agreement dictated that SVU would be assigned the Note if and when Nellie Mae drew from the reserve account. This evidence alone, if proved, would be insufficient circumstantial evidence of an assignment of a negotiable instrument. *New Haven Savings Bank,* 431 F.Supp.2d at 198 (describing evidence sufficient to show a transfer of a note). Even if circumstantial evidence was sufficient to prove assignment and all conditions precedent under the Agree-

of an assignment, one of SVU's two avenues for showing rights as a nonholder in possession is eliminated.

*Subrogation of Rights under the Note*

■■■■■ A nonholder in possession of a non-negotiated negotiable instrument can acquire the rights of a holder through the common law doctrine of subrogation, which allows the payor on a debt to step into the shoes of the creditor vis-à-vis the party obligated to pay.[39] Although often stemming from contractual relationships, such as here, the doctrine of subrogation is primarily an equitable remedy designed to avoid windfalls. *Reliance Insurance v. Boston*, 71 Mass.App.Ct. 550, 884 N.E.2d 524, 530 (2008); *Goodman Industries, Inc. v. Max Goodman & Sons Realty, Inc.*, 21 B.R. 512, 519 (Bankr.D.Mass.1982). The general principle of the doctrine of subrogation is that a guarantor required to pay the debts of the principal on a note will be subrogated to the rights of the creditor against the principal. *Goodman Industries*, 21 B.R. at 519. In addition to acceding to the rights of the creditor, the guarantor inherits only those rights the creditor had at the time of subrogation. *McCabe v. Braunstein*, 439 B.R. 1, 6 (D.Mass.2010). In determining whether subrogation applies, Massachusetts has fashioned a five factor test; although, the doctrine may still apply absent one of the five factors. *East Boston Savings Bank v. Ogan*, 428 Mass. 327, 701 N.E.2d 331, 334 (1998). Equitable subrogation will apply if:

> (1) the subrogee made the payment to protect his or her own interest; (2) the subrogee did not act as a volunteer; (3) the subrogee was not primarily liable for the debt paid; (4) the subrogee paid off the entire encumbrance; and (5) subrogation would not work any injustice to the rights of the junior lienholder.

*Id.* In light of the five factor test, the Court concludes that SVU has not established all five factors and, as such, has failed to establish that it was subrogated to the rights of Nellie Mae under the Note.[40]

---

ment had been satisfied, the presence of the recourse agreement would only establish that SVU was entitled to an assignment of the Note from Nellie Mae, not that Nellie Mae had assigned SVU the Note. Other circumstantial evidence of an actual assignment would be needed in order for SVU to succeed on this theory, such as records of an assignment, copies of the Note indorsed to SVU, admissible communications referring to and regarding the assignment, and/or notations on Debtor's credit report consistent with a transfer of Nellie Mae's interest in the debt. SVU has not provided the Court with additional circumstantial evidence that could lead the Court to believe that an assignment from Nellie Mae to SVU has taken place.

**39.** SVU did not sign the Note as a guarantor. Instead, SVU and Nellie Mae entered into a separate, independent recourse agreement. Common law principles of subrogation, rather than Massachusetts' version of the UCC, apply to determine if SVU ever acquired the rights held by Nellie Mae under the Note. *Cadle Co. v. DeVincent*, 57 Mass.App.Ct. 13, 781 N.E.2d 817, 820 (2003) ("The defendant, having executed a separate contract of guaranty, rather than a guaranty that is part of the note, is governed by the provisions of that separate contract without immediate reference to the law governing negotiable instruments."). Section 3–301 and 3–309 still apply and determine whether SVU may enforce the Note, given that SVU has or has not acquired the rights held by Nellie Mae through subrogation.

**40.** Although subrogation may still apply in the absence of one or more of the five factors, *Ogan*, 701 N.E.2d at 334, the factors SVU has failed to prove are fatal to its claim. In particular, SVU's failure to prove that it ever paid Nellie Mae in accordance with the terms of the Agreement on the Note is a crucial element. Without paying on the debt of another, there is no right to subrogation of the rights under that debt.

Based on the evidence and record before the Court, SVU has sufficiently established factors (3) and (5). SVU was not primarily liable on the Note. *See* Def.'s Ex. K, ¶ F, *Dudley*, No. 11–05040, ECF No. 66. The Agreement between SVU and Nellie Mae also provides circumstantial evidence that SVU was secondarily liable on all debts issued by Nellie Mae to SVU's students. *See* Def.'s Ex. A, ¶ 1, *Dudley*, No. 11–05040, ECF No. 66. Furthermore, it is apparent that there are no junior lienholders involved in this case.

SVU has not presented evidence sufficient to establish the remaining *Ogan* factors because it has not provided evidence that it paid Nellie Mae in accordance with the Agreement on the Note. The only exhibits relevant to the payments made to Nellie Mae are Defendant's Exhibits B–3 and B–10, neither of which provides any evidence that payment was made on the Note. *See* Def.'s Ex. B–3 and B–10, *Dudley*, No. 11–05040, ECF No. 66. Those documents merely show reserve account balances and credits from the reserve account. There is no mention of the Note. Furthermore, SVU's witnesses provided little credible evidence as to when the Note was paid, how it was paid, how much was paid, how much was owed, or whether it was paid in conjunction with other loans, etc. *See generally* Jan. 23 H'rg Tr. Without evidence of a payment, the Court cannot determine whether SVU paid on the Note, let alone whether payment was made to protect SVU's interest under the Agreement, whether SVU acted as a volunteer, or whether SVU paid the entire amount. *See Ogan*, 701 N.E.2d at 334. Even if the Court assumed that a payment had been made, it would be impossible to determine, based on the record before the Court, whether the amount paid was for the entire amount because there is no evidence of what that amount is, when it was due, or even if demand was ever made by

Nellie Mae. Without such evidence, it is not possible to find that SVU has established the existence of a sufficient number of the *Ogan* factors to permit it to succeed on its common law subrogation theory.

It is important at this juncture to address a statement made by the Court in an earlier released opinion and order in this case. The Court stated in its earlier summary judgment opinion and order, "When Ms. Dudley failed to repay the loan, Nellie Mae charged the loan, plus interest against SVU's reserve account." Decision and Order at 2, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr.W.D.Va. Dec. 20, 2012) ECF No. 26. This statement was not issued as a finding of fact; rather, as the case was being heard on summary judgment, the Court treated the statements of fact in the Debtor's complaint as admitted and true for purposes of ruling on SVU's motion for summary judgment. *Meltzer v. Atlantic Research Corp.*, 330 F.2d 946, 947 (4th Cir.1964); *see* Debtor's Complaint at ¶ 24, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr.W.D.Va. July 7, 2011) ECF No. 1 ("Upon information and belief based upon a letter dated February 1, 1999, the debt owed to Nellie Mae was paid in full from a 'reserve' fund held on behalf of Southern Virginia University. A copy of this letter is attached as Exhibit H.").

At this current stage of the litigation, the Court could consider Debtor's factual assertion in her complaint to be a judicial admission withdrawing the fact from issue and dispensing wholly with SVU's need to prove that Nellie Mae charged SVU's reserve account for the full amount due on the loan, plus interest pursuant to the Agreement between Nellie Mae and SVU. 2 McCORMICK ON EVID. § 254 (7th ed.); *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 265 (4th Cir.2004)

(citing *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 477 (5th Cir.2001)) ("Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention."). The Court, however, has the discretion to relieve a party of a judicial admission when it appears the admitted fact is untrue and the result of a mistaken belief when made. *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir.1963); *Coral v. Gonse*, 330 F.2d 997, 998 n. 1 (4th Cir.1964). Debtor's assertion in her complaint was made on information and belief; the basis of which stems from a document addressed to SVU from someone at Nellie Mae that was deemed inadmissible by this Court when SVU moved for its admittance into evidence. *Compare* Debtor's Complaint at ¶ 24 and Ex. H, *Dudley*, No. 11–05040 (Bankr.W.D.Va. July 20, 2011), ECF No. 1 *with* Def.'s Ex. B–31, *Dudley v. S. Va. Univ.*, No. 11–05040 (Bankr.W.D.Va. Jan. 16, 2013) ECF No. 66; *see* Jan. 23 Hr'g. Tr. at 31–32, 49–54. Without the letter, the Debtor would have had no basis for believing such fact to be true, nor would the Court expect her to have personal knowledge of the financial affairs of SVU as they pertain to the University's relationship with Nellie Mae. According to Ms. McDonnell, SVU's witness from Nellie Mae, this letter was provided by SVU, not Nellie Mae, as one might believe by looking at the contents of the document. Jan. 23 Hr'g. Tr. at 25–26. Furthermore, the record is devoid of any additional evidence that could suggest that Debtor's assertion was true. Because Debtor's assertion appears to be untrue and based on a mistaken belief that stems from an inadmissible and misleading document, the Court finds that Debtor's assertion in her complaint— Nellie Mae charged the outstanding balance of the loan, plus interest against the reserve fund—is not a judicial admission and will not relieve SVU of its burden of producing admissible evidence capable of establishing such fact. Without evidence of a payment from SVU to Nellie Mae, SVU cannot satisfy sufficiently the requirements of *Ogan* to the degree necessary to succeed on its theory of subrogation. Therefore, the Court finds that SVU has failed to show that it was subrogated to the rights of Nellie Mae under the Note.

## Conclusion

As a threshold matter to proving its case, SVU needed to show that it was entitled to enforce the Note against the Debtor. Based on the record before the Court, SVU has failed in this respect. Enforcement of a negotiable instrument under Massachusetts law requires that the party seeking to enforce the instrument show that it was transferred physical possession of the instrument. SVU's evidence failed to establish that Nellie Mae ever transferred possession of the Note to SVU.

Even if the Court was to assume or find that a transfer of possession of the Note had occurred, SVU would still need to establish that when the Note was lost or destroyed, it was either a holder or a nonholder in possession with the rights of a holder. SVU was unable to establish either of these avenues of enforcement under section 3–309. First, SVU could not establish that it was a holder of a negotiated instrument because it provided no evidence establishing that Nellie Mae had indorsed the Note to SVU. Second, SVU could not provide the Court with direct evidence of an assignment of the Note from Nellie Mae or sufficient evidence to find that SVU had been subrogated to the rights of Nellie Mae. Either theory would have been sufficient for the Court to find that SVU was a nonholder in possession with the rights of a holder. Even if the Court was to assume or find that a transfer of possession had occurred, however,

the record is devoid of evidence that would permit the Court to find the SVU was entitled to enforce the Note under section 3–309. Therefore, SVU has failed to show that it was entitled to enforce the Note against the Debtor. Without such a showing, the Court cannot conclude that the debt underlying the state court default judgment is the same debt as that evidenced by the Note. As the two debts are not the same, the Court need not address the question of whether the debt maintains its non-dischargeable character once transferred from an educational student loan lender to a third party. SVU has failed to carry its burden and, therefore, the Court finds that its debt, which it attempted to enforce in state court post-discharge, is a dischargeable debt and was discharged by Court order on September 21, 2010. A corresponding and contemporaneous order will be entered consistent with the above memorandum opinion.

Copies of this memorandum opinion shall be delivered to the following parties: the debtor, Cynthia Annette Riley Dudley, 512 Greenville School Road, Greenville, VA 24440; counsel for the debtor, Roland S. Carlton, Jr., Carlton Legal Services, PLC, 118 MacTanly Place, Staunton, VA 24401; the creditor, Southern Virginia University, Robert E. Huch, Registered Agent, Southern Virginia University, One University Hill Drive, Buena Vista, VA 24416; and counsel for the creditor, Grant A. Richardson, 100 South Main Street, Bridgewater, VA 22812.